S. S. Ballin Agency, Inc., et al. [1] v. Commissioner. S. S. Ballin Agency, Inc. v. Commissioner
Docket Nos. 6225-66, 6226-66, 932-67.
United States Tax Court
T.C. Memo 1969-203; 1969 Tax Ct. Memo LEXIS 100; 28 T.C.M. (CCH) 1058; T.C.M. (RIA) 69203; September 29, 1969, Filed Edwin Fradkin and Scott A. Dahlquist, for petitioners in Docket Nos. 6225-66 and 6226-66. Leonard J. Schwartz and Selwyn A. Horvitz, 10th Floor, 1401 Walnut St., Philadelphia, Penn., for petitioners in Docket No. 932-67. Owen A. Knopping, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: In these consolidated cases respondent determined the following Federal income tax deficiencies: Petitioners
Docket No.
Year
Deficiency
S. S. Ballin Agency, Inc.
6225-66
1962
$27,024.70
S. S. Ballin Agency, Inc. and Sub- sidiary Company
6226-66
1960
15,759,10
1961
31,838.55
Joseph and Jeanette Delman
932-67
1962
18,988.79
1963
5,955.48
The principal controversy in these proceedings arises out of the purchase by the S. S. Ballin Agency, Inc., of insurance businesses from the Delmans and others. In 1960 the Delmans, the only stockholders of the Delman Agency, Inc., sold all their stock therein to S. S. Ballin Agency, *102 Inc., for $44,000. In that same year, Joseph H. Delman also sold United Health Agency, a sole proprietorship, to S. S. Ballin Agency, Inc., for $156,000. The parties reported the transactions inconsistently. On their Federal income tax returns the Delmans treated the $44,000 and $156,000 as proceeds from the sale of capital assets. S. S. Ballin Agency, Inc., treated the entire $200,000 as a cost of "earned commissions on renewal premiums" and claimed a deduction for the amortization of such cost. Respondent is seeking the proper tax treatment of the respective parties consistent with the facts relating to the transactions. The following issues are presented for decision: 1. Whether petitioner S. S. Ballin Agency, Inc., is entitled to a depreciation deduction under section 167, Internal Revenue Code of 1954, [2] in each of the years 1960, 1961, and 1962 with respect to assets received by it in purchasing all or part of insurance agency businesses. 2. Whether petitioners Joseph and Jeanette Delman are entitled to treat the sale of their stock in the *103 Delman Agency, Inc., and the sale of an insurance business, known as Joseph H. Delman trading as United Health Agency, as the sale of capital assets. 3. Whether petitioner S. S. Ballin Agency, Inc., is entitled to a depreciation for a covenant not to compete contained in the purchase agreement of the Delman insurance agency where no amount was specifically allocated to the covenant in the agreement. 4. Whether "advances" to the S. S. Ballin Agency, Inc., by its principal 1060 stockholder, S. S. Ballin, constituted bona fide loans or contributions to capital. Findings of Fact Some of the facts have been stipulated. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference. S. S. Ballin Agency, Inc. (herein called Ballin, Inc.), is a New Jersey corporation which had its principal place of business in Union, New Jersey, at the time it filed its petition in this proceeding. Its Federal corporate income tax returns for the taxable years 1960, 1961 and 1962 were filed with the district director of internal revenue at Newark, New Jersey. Joseph H. Delman and Jeanette Delman are husband and wife. Their legal residence was Elkins Park, *104 Pennsylvania, at the time they filed their petition herein. They filed their Federal joint income tax returns for the taxable year 1962 with the district director of internal revenue at Newark, New Jersey, and for the taxable year 1963 with the district director of internal revenue at Philadelphia, Pennsylvania. Facts Relating to the Sale and Purchase of Insurance Businesses For the period beginning December 7, 1955, and ending in June 1960, the Delmans owned all 11 shares of the issued and outstanding stock of the J. H. Delman Agency, Inc. (herein called Delman Agency), a New Jersey corporation engaged in the business of operating an insurance agency. Joseph Delman (herein sometimes called Delman) owned 6 shares and his wife, Jeanette, owned 5 shares. From September 1954 through June 1960, Delman was also engaged in the business of selling hospitalization, accident and health insurance policies under the trade name of United Health Agency (herein referred to as UHA). Both the Delman Agency and UHA had agency agreements with the American Casualty Company of Reading, Pennsylvania (herein referred to as ACC). U/nder these agreements, the Delman agencies were appointed agents *105 "for the purpose of procuring applications * * * for Accident and Health Insurance," and they were authorized to: issue and deliver policies, certificates, endorsements and binders which [ACC] may authorize to be issued and delivered; to collect and receipt for premiums therefor; to cancel such policies in the discretion of the agent where cancellation is legally possible and perform such duties as may be required by [ACC]. The agreement further provided that upon termination - the Agent having properly accounted for and paid over premiums for which he may be liable, the Agent's records, use and control of expirations shall remain the property of the Agent and be left in his undisputed possession; otherwise the records, use and control of expirations shall be vested in [ACC]. Expirations in the insurance business are copies of the agency's insurance policies in force and contain information which enables the agency to attempt to renew the policies upon expiration. The expirations, which belonged to the agents under the terms of the above agreement, are valuable because they are a source of potential income and are transferable. All the accident and health policies issued *106 through the Delman Agency and UHA were of finite durations, i.e., for terms of 1 month, 3 months, 6 months, or 12 months. No policy was issued for more than a 1-year term. Nor were any of the policies guaranteed renewable or noncancellable. A policy could be renewed only with the consent of ACC. As each term expired, if either ACC or the policyholder chose not to renew, the policy lapsed and the agent received no further commissions with respect thereto. Under the agency agreements with ACC, the Delman Agency and UHA did not have a "vested interest" in commissions on renewal premiums. If the agency relationship between UHA and ACC were terminated, ACC would not renew the policies written by the Delman agencies. If the agencies had previously paid all the premiums due to ACC, the right, title, and interest in the records and the use and control of all expirations relating to such policies would belong to them. Under these circumstances the Delman agency and UHA could reinsure all of their ACC accident and health business with another underwriter, and thereafter ACC would be under no obligation to pay them any future commissions. The agency's right to future commissions with respect *107 to such business would depend upon it rewriting the business with another underwriter. 1061 In contrast, under life insurance agency contracts the agent has a vested interest in future commissions with respect to life insurance policies written, even if the agency relationship with the underwriter is terminated. Upon the termination of a life insurance agency contract, the business remains that of the underwriter who is obligated to pay the agent a specified commission on a certain number of annual premiums after the issuance of the policy. ACC, at times, exercised its right not to renew policies issued through UHA and the Delman Agency. ACC had the power of altering the scope of coverage and thereby reducing its risks by requiring policyholder to execute waivers of liability for certain illnesses or category of coverage as a condition to its consent to renew a policy. The insurer of life insurance policies does not have this power to effect the lapse rate of the policies. The cost to the agencies of putting business on the books was approximately $40 per insured. Thus it was important to keep the business in force by preventing the policies from expiring or lapsing. Accordingly, *108 the Delman Agency and UHA sent out a premium notice approximately 15 days prior to the expiration date. If the premium was not remitted on time, a second notice was sent out about 10 to 15 days after the due date, and this was followed by a third notice if there was no response. Finally, if the policyholder did not respond to the notices, either one of the salesmen or Delman himself would contact him by telephone. Of the 250 to 300 policyholders a month who failed to remit their premium payments after receiving the notices, Delman, through his efforts of personally contacting them, was able to conserve all but 100 to 150 lapses. The Delman agencies usually processed claims for its customers, i.e., the policyholder would present his claim to the agency and it would then forward it to ACC. In many cases, Delman, through his personal efforts, was able to get ACC to honor a claim which it had initially decided to deny. Approximately one out of ten applicants for health and accident insurance had to execute waivers of liability with respect to certain illnesses or diseases before ACC would insure them. Approximately four out of 10 claimants who had filed claims for benefits under the *109 policies handled by the Delman agencies were required by ACC to execute waivers before ACC would agree to renew their policies. The Delman agencies kept all relevant information as to the policyholders and their coverage on premium record cards. These cards indicated, among other things, the amount of coverage provided by the policies, the type of insurance, the initial issuance date of the policies and their terms, policy number, the name, address, occupation and employer, and the birth date of the individual. The cards also provided a continuing entree to and contact with a client. Under the agency agreements the Delman agencies received from ACC a flat commission of 35 percent of the premiums paid on the sale of accident and health policies. As contrasted with life insurance policies, this same flat rate of 35 percent of the premiums would be paid as long as the policies continued in force. With respect to the sale of life insurance policies, the agent receives a greater commission in the year of sale than he does in subsequent years. For example, the life insurance agent would receive a commission of approximately 85 percent of the premium paid in the first year and a 5 percent *110 commission on the premiums for the following nine years. The difference between the commission structures of health and accident policies, on the one hand, and life insurance policies, on the other, results from the fact that health and accident policies require more servicing than life insurance policies. Prior to 1960, Delman had two full-time clerks and a part-time bookkeeper who maintained his books and bank account. The two clerks were frequently in contact with policyholders; they handled complaints and discussed various problems with respect to policy coverage. Delman was not personally known to the customers of UHA or the Delman Agency. On July 1, 1960, the Delmans as stockholders of the Delman Agency and Delman, trading as UHA, entered into an agreement to sell the stock of the Delman Agency and the UHA business to Samuel S. Ballin and/or Ballin, Inc., for $44,000 and $156,000, respectively. At the time of the sale of the 11 shares of stock of the Delman Agency, the Delmans' basis in such stock was $500. The Delmans incurred selling expenses of $5,000 with respect to the sale of the stock and the UHA business. Of the $5,000 expenses, $1,100 ($44,000/$200,000 X $5,000) *111 is 1062 attributable to the sale of the Delman Agency stock and $3,900 ($156,000/$200,000 X $5,000) is attributable to the sale of the UHA business. In arriving at the purchase prices of the two agencies, the parties determined the monthly commission income of each and multiplied these figures by 19. The agreement of sale, dated July 10, 1960, provides, in pertinent part, as follows: WHEREAS, the purchasers desire and intend to purchase and the sellers to sell the aforesaid agency contract between JOSEPH H. DELMAN, trading as UNITED HEALTH AGENCY, and AMERICAN CASUALTY COMPANY and the AMERICAN CASUALTY COMPANY business of said DELMAN, trading as UNITED HEALTH AGENCY thereunder, as the same are hereinafter specifically described and also all of the issued and outstanding shares of capital stock of said J. H. DELMAN AGENCY, INC. Now, for and in consideration of the covenants, promises and agreements hereinafter set forth, and other good and valuable considerations, the parties do hereby mutually covenant and agree expressly as follows: 1. All of the issued and outstanding shares of the capital stock of J. H. Delman Agency, Inc., consisting of 6 shares owned by Joseph H. *112 Delman, and 5 shares, owned by Jeanette Delman, shall be sold, assigned and transferred to S. S. Ballin Agency, Inc., one of the purchasers * * * 2. The aforesaid agency agreement between American Casualty Company and J. H. Delman Agency, Inc., shall be in force and effect on July 1, 1960, and the same together with said corporation's right to expirations and to commissions on premiums due and collectable from policy holders on and after July 1, 1960 (but not due or accruable prior thereto) shall remain as assets of the said J. H. Delman Agency, Inc., at the time of the transfer of the said stock, together with all contracts with agents and brokers pertaining and relating to the business of the said corporation. 3. The said Joseph H. Delman, trading as United Health Agency, shall sell, transfer, and assign to the said Samuel S. Ballin and S. S. Ballin Agency, Inc., or to either of them as they may determine, the certain agency agreement dated and amended January 1, 1957, between Joseph H. Delman and American Casualty Company, including "the right to expiration" thereunder and to commissions on premiums due and collectable from American policyholders on and after July 1, 1960 (but *113 not due or accruable prior thereto) but excluding the right to payment of commissions earned on or before June 30, 1960, but payable on a deferred basis pursuant to Paragraph 4 of the said agency agreement which right to payment is hereby expressly reserved by the said Joseph H. Delman and is not included in this sale. Said sale is to include all contracts with agents and brokers between Joseph H. Delman, trading as United Health Agency, as pertain to or relate to American Casualty business. * * * 7. Between the date hereof and said date of closing, the sellers shall continue to operate the business of United Health Agency, and J. H. Delman Agency, Inc., in accordance with their standard operating procedures * * * 8. All new business generated between June 1, 1960, and the date of closing by Joseph H. Delman doing business as United Health Agency, under the said subsisting contract between said Joseph H. Delman and American Casualty Company shall be assigned to the purchasers without any further adjustment to or in favor of either the sellers or the purchasers excepting that all initial commissions on this new business, so generated prior to closing shall be paid to or retained *114 by the said Joseph H. Delman (and the purchase price aforesaid shall not be abated by reason thereof) and in consideration thereof, the said Joseph H. Delman shall bear any and all operating expenses incurred in the conduct of the business of United Health Agency to the date of closing, including any cost of procuring such new business. 9. This sale shall include in addition to the right, title and interest of Joseph H. Delman, trading as United Health Agency, in and to the certain subsisting contract between him and American Casualty Company hereinbefore referred to, all originals and copies of customers or policyholders lists and records, accounts and receivables accruing on and after July 1, 1960 (but not earlier), to said United Health Agency under the said agreement with American Casualty Company, and all the books, records and documents relating to or flowing from said agency agreement, the name United Health Agency and the exclusive right upon the part of purchasers to use the same. This sale does not include the right to deferred commissions, reserve to Joseph H. Delman in and by 3 hereinabove and which are thereafter payable under the terms of said 4 of the said American *115 Casualty agreement, which shall remain the property of Delman and be paid to said Delman as therein provided, the same having been expressly 1063 excepted from this sale as expressly in 3 hereinabove. * * * 11. The aforesaid total purchase price, as the same shall be determined at the time of closing pursuant to the terms of this agreement, shall be paid in the following manner: a. $5,000.00 in cash upon the execution and delivery of this agreement, which said sum of $5,000.00 shall be credited; and b. On the closing of title pursuant to this agreement there shall be paid to the sellers a further sum of money, which when added together with the sum of $5,000.00 paid upon the signing of this agreement under subdivision a of this paragraph, shall be equal to and be 30 percentum of the total purchase price as the same shall be determined pursuant to this agreement; and c. The balance of said purchase price, to wit, 70 per centum of the total purchase price as determined on the date of closing by the terms of this agreement, shall be evidenced and paid by a series of 30 consecutive monthly promissory notes made by Samuel S. Ballin and S. S. Ballin Agency, Inc., each in an equal *116 amount and made in an amount which shall be 1/30th of the said balance of the purchase price under this subparagraph c, together with interest at the rate of 6% per annum. Each of said notes shall be in the form attached hereto, marked Schedule "A", and made part hereof, and shall be made in a series, the first of said notes being payable on January 1, 1961, and the remaining notes in said series being payable on the first day of 29 consecutive months thereafter, all of which said notes shall be payable to the sellers and shall be dated as of the date of the closing of this agreement, and shall be payable at a banking institution selected by the seller, and shall contain an acceleration clause effective in the event of and upon default in the payment of any one of said series of notes, in the event that any one of said notes should not be paid within ten days of the date when the same is payable by the terms thereof. * * * 16a. The sellers have undertaken heretofore to obtain consents to an assignment of the agency agreement hereinbefore referred to between American Casualty Company and Joseph H. Delman, trading as United Health Agency, and to obtain the consent of the American Casualty *117 Company to the transfer of the stock ownership of J. H. Delman Agency, Inc., from purchasers to sellers. 16b. The sellers will agree that from and after the closing date, for a period of five years from said closing date, that they will not engage in any business of any kind or another (not limited to the business of insurance) either directly or indirectly as proprietor, officer, director, agent, employee, partner or in any other capacity with any person who, on the closing date, is listed upon the books and records of United Health Agency and of J. H. Delman Agency, Inc., as a policyholder of American Casualty Company, nor with any agent or broker, now doing American Casualty business with said United Health Agency or J. H. Delman Agency, Inc., except that isolated instances of breaches by Delman of such covenant when doing business, up to and not exceeding 50 policyholders in number in any one year of said period, upon the condition hereinafter set forth, shall not be or be deemed to be actionable so as to entitle the sellers or either of them to a restraint, injunction, damages or other relief or constitute an off-set against the promissory notes aforesaid, the condition hereinbefore *118 referred to is that in such cases of breaches by Delman of this restrictive covenant the initial and all renewal commissions received shall be forthwith following written demand turned over to Samuel S. Ballin, and the policyholders shall be identified to S. S. Ballin Agency, Inc., and any rights to commissions or commissions earned or paid under such policies, shall be on written demand immediately transferred to S. S. Ballin Agency, Inc. The aforesaid restrictive covenant, however, shall be effective only so long as each of said serial promissory notes is paid in accordance with its tenor or within the grace period. In the event of a default in any one of said promissory notes beyond its particular grace period, said restrictive covenant shall be and become void and unactionable. * * * 21. Joseph H. Delman, trading as United Health Agency, is the holder of a contract with one, Hugo G. Hill, therein designated as a sub-agent of United Health Agency and American Casualty Company of Reading, Pennsylvania. Said Delman hereby further agrees to assign said contract to the purchasers. Purchasers agree to assume said contract with Hugo G. Hill and to hold sellers harmless from and against *119 any liability thereunder accruing on and after July 1, 1960. On or about July 10, 1960, UHA and Ballin entered into an agreement assigning the agency agreement between ACC and UHA to Ballin, in accordance with the terms of the agreement for the sale of the UHA business effective July 1, 1960. The agreement assigning the ACC agency agreement, provided, in part: 1. United has granted, bargained, sold, assigned, transferred and set-over, and by 1064 these presents does hereby grant, bargain, sell, assign, transfer and set-over unto Ballin, his representatives and assigns, that certain Agency Agreement between American Casualty Company of Reading, Pennsylvania and said Joseph H. Delman, trading as United Health Agency, bearing date Janury 1, 1957, and all amendments thereto including all of United's contracts with agents and brokers pertaining or related to American Casualty Company's business and also including the right to expirations under said Agency Agreement of January 1, 1957, as amended, and to commissions on policies due and collectable from policyholders of American Casualty Company of Reading, Pennsylvania, on and after the date hereof (but not due or accruable prior *120 thereto), to have and to hold the same unto the said Ballin, his representatives and assigns forever, subject, however, to and expressly excluding the right to payment of commissions earned on or before June 30, 1960, but payable on a deferred basis pursuant to Paragraph 4 of the aforesaid Agency Agreement, which right to payment is hereby expressly reserved unto Joseph H. Delman. 2. In addition to the foregoing, United hereby assigns and transfers unto Ballin, the following: - (a) The originals and copies of its American Casualty Company's customers and policyholders' lists and records; and (b) Accounts and receivables accruing on and after July 1, 1960 (but not earlier) to said United under the said Agreement with American Casualty Company dated January 1, 1957 (except as hereinabove expressly provided); and (c) All of United's books, records and documents relating to or flowing from said American Casualty Company Agency Agreement of January 1, 1957; and (d) The name of "United Health Agency", together with the exclusive right upon the part of Ballin to the use thereof. Ballin Inc., at all times material herein, was operated as a "lead agency." It produced leads or responses *121 form persons indicating an interest in obtaining accident and health insurance by newspaper advertising and direct mail and telephone solicitation. Such leads would then be followed up by the agency's salesmen. In the acquisition of the Delman Agency and UHA, Ballin acquired the following expirations: Term
UHA
DelmanAgency, Inc.
Total
Monthly
782
283
1,065
Quarterly
3,156
295
3,451
Semi-annual
477
37
514
Annual 1,201
132
1,333
5,616
747
6,363
Ninety percent of the business transferred to the Ballin Agency was seasoned business, i.e., business which has been on the books for more than one or two years. Seasoned business has a greater retention rate because the policyholders have become accustomed to making payments and sending the premiums to the Agency. Pursuant to the sale agreement, Delman conveyed to Ballin and Ballin Agency, Inc., (1) the UHA Agency agreement with ACC, (2) all of UHA's contracts with agents and brokers pertaining to or relating to ACC's business, (3) the right to expirations under the UHA-ACC agency agreement (including the right to future commissions on renewal of expiring policies, if any, earned after July 1, 1960), *122 (4) all originals and copies of customers or policyholders lists and records, (5) all the books, records and documents relating to or flowing from the agency agreement, (6) the name, "United Health Agency," and (7) the exclusive right on the part of Ballin to use the name, "United Health Agency." Of the Delman employees, one full-time and two part-time salesmen and the two full-time office clerks accepted employment with the Ballin Agency after its acquisition of Delman's businesses. After the acquisition Ballin Inc. changed the name of the Delman Agency to "United Health Agency, Inc.", and continued to use the Delman Agency's incorporation date, December 7, 1955, as the incorporation date of UHA, Inc. On its Federal corporate income tax returns for the years 1960 and 1961, UHA, Inc., appears as a subsidiary of Ballin Inc.Ballin registered the fictitious name, "United Health Agency, Inc.," and also prominently displayed it in the window of its office in Union for a "year or two." The main purpose for displaying the name in the window was for identification so that if policyholders were to seek out the office, they would be able to identify and associate the previous agency name *123 with that of Ballin Inc.
Immediately upon the consummation of the purchase of UHA and the Delman 1065 Agency, Ballin sent a notice to the former policyholders of UHA and the Delman Agency, notifying them that the office of UHA and the Delman Agency had moved to Ballin's address in Union, New Jersey. The name of Ballin Inc. did not, however, appear on the announcement. The announcement contained the following statement: UNITED HEALTH AGENCY AND J. H. DELMAN AGENCY of AMERICAN CASUALTY COMPANY are pleased to announce that, effective July 1, 1960 their offices will be located at 2165 Morris Avenue Union, New Jersey
Telephone: MUrdock 7-2600 Formerly: 12 South Orange Ave., South Orange, N.J.
Some months later, possibly up to a year later, Ballin Inc. sent a second notice to the former policyholders of UHA and the Delman Agency, Inc., designated, "Announcement of Consolidation." This announcement stated: In order to provide even better service to our policyholders the billing of AMERICAN CASUALTY COMPANY premiums, which was formerly done in the names UNITED HEALTH AGENCY, J. H. DELMAN AGENCY, INC., and S. S. BALLIN AGENCY, INC., have been consolidated, and are now *124 being billed in the name: AMERICAN CASUALTY COMPANY S. S. BALLIN AGENCY, INC. 2165 Morris Avenue Union, New Jersey
Please make checks payable to American Casualty Company or S. S. Ballin Agency, Inc. The record cards transferred to Ballin Inc. under the sale agreement provided a simple system for identifying coverage quickly and a ready source of information relating to the status of a policy, such as the beginning and expiration dates of the policy, the type of insurance, and the coverage. After the Delman acquisition, Ballin Inc. changed its record card system to conform to the record card system received from Delman. During the negotiations for the sale of UHA and the Delman Agency both Delman and Ballin were represented by counsel. Martin D. Cohen represented the Delmans and Kenneth Lawlor represented the Ballins. After preliminary telephone conversations, the first formal meeting of the parties occurred on May 13, 1960, at Cohen's office. Present at this meeting were Ballin, Delman, Cohen, Lawrence N. Rosenbaum (Cohen's partner), and I. William Reisman (Delman's brother-in-law, who is also an attorney). Lawlor, Ballin's attorney, was not present at this meeting. *125 Among the topics discussed was a covenant not to compete. The Delmans agreed to execute a covenant, which would set forth whatever Ballin required, "as an incident to the sale of the businesses." Cohen, however, specifically informed Ballin that "no part of the purchase price was to be allocated" to the covenant and that the purchase price was for the businesses. Ballin replied that he fully understood why Delman did not want, or intend, to allocate any portion of the purchase price to the covenant and that it was quite all right with him. Although Lawlor was not present at the initial meeting in Cohen's office, he and Cohen had numerous telephone conversations with respect to the transaction. Lawlor transmitted the first draft of the agreement to Cohen. On the closing date, the Ballins, Delmans, Lawlor and Cohen were all present in Cohen's office to consummate the sale by executing the necessary documents. Throughout the negotiations Ballin was fully aware that Delman was in the process of negotiating the purchase of another insurance agency in Philadelphia, Pennsylvania, and that the Delmans were going to leave New Jersey for permanent residence in Philadelphia to operate the *126 insurance agency there. Shortly after consummation of the sale of their insurance businesses to the Ballins, the Delmans moved to Philadelphia. No value was assigned to the covenant not to compete during the negotiations and bargaining nor in any of the agreements entered into as part of the sale of UHA and the Delman Agency to Ballin. For the years 1960, 1961, and 1962, Ballin Inc. employed Richard Plasschaert as the office manager of its Union, New Jersey, office. During this period of time, Ballin followed a program of conservation, i.e., it stressed keeping all business in force, including that acquired from the Delmans. The principal means of accomplishing this purpose was the use of premium notices in conjunction with overdue notices. These notices were sent to the policyholders by mail. Ballin Inc. also used what was called a conservation letter, which Plasschaert found to be valuable. The purpose of the letter was to encourage a policyholder who had allowed his policy to lapse to renew it 1066 by setting out a number of reasons why the policy should be continued in force. On occasion, the Agency's salesmen would personally contact a client who had allowed his policy *127 to lapse in an attempt to rewrite the business. And, if any of the accounts acquired from the Delmans lapsed and were rewritten, they were written under the Ballin Agency name and integrated with its other business. After the acquisition of the Delmans' insurance businesses, Ballin Inc. provided the same services as the Delmans had. It mailed the premium notices electronically prepared in bulk by ACC; it collected premiums; processed waivers; handled claims of the insured; and tried to conserve, or keep in force, as much business as possible. Ballin Inc. as of the date of the trial herein was still servicing policyholders and receiving commissions on accounts acquired from the Delmans. The commissions earned by Ballin Inc. with respect to the insurance business acquired from the Delmans for the period from July 1960 until September 1968 are as follows: 1960
1961
1962
1963
1964
January
$5,495.42
$4,708.92
$4,480.33
$3,191.18
February
6,681.82
5,526.65
4,469.64
3,781.85
March
7,814.59 6,465.57
5,270.90
4,574.79
April
5,930.85
5,190.03
4,558.89
3,572.44
May
5,633.64
4,655.14
4,098.78
3,045.62
June
6,927.52
5,675.83
4,984.34
4,258.06
July
$ 4,621.35
5,313.57
4,375.08
3,165.23
2,978.03
August
4,419.46
5,871.04
4,535.01
3,999.11
3,628.03
September
7,589. 29
6,277.60
5,489.80
4,520.60
3,625.64
October
6,547.46
5,502.37
4,227.04
3,882.14
3,291.21
November
6,929.18
5,456.98
4,227.04
3,677.98
3,365.76
December
7,583.99
6,326.05
5,297.23
4,639.83
4,388.48
Year Total $37,690.73
$73,231.45
$60,373.34
$51,747.77
$43,701.09
Cumulative Totals
$37,690.73
$110,922.18
$171,295.52
$223,043.29
$266,744.38
*128 1965
1966
1967
1968
January
$3,096.86
$2,392.22
$1,895.15
$ 1,703.77
February
3,598.36
2,970.01
2,187.92
2,024.28
March
4,524.65
3,822.44
2,744.14
2,300.14
April
3,345.39
2,590.21
1,940 .33
1,841.17
May
3,036.51
2,547.09
1,882.01
1,850.92
June
3,939.56
2,956.10
2,385.20
1,582.06
July
2,898.08
2 ,165.22
1,789.71
970.29
August
2,000.79
2,105.25
1,919.80
1,201.87
September
3,692.90
2,592.37
2,317.31
1,082. 66
October
3,131.14
2,314.82
1,983.85
November
2,856.21
2,268.44
1,999.10
December
3,896.34
2,909.30
2,504.80
Year Total $40,016.79
$31,633.47
$25,549.32
* $14,557.16
Cumulative Totals
$306,761.17
$338,394.64
$363,943.96
$378,501.12 1067 During the years 1958 through 1962, Ballin Inc. acquired a number of other insurance businesses or parts thereof in addition to the acquisitions from the Delmans. On its Federal corporate income tax returns for the years 1960, 1961, and 1962 Ballin Inc. claimed deductions of $29,640.42, $57,926.87, and $61,939.62, respectively, as amortization of the cost of the insurance businesses purchased. In computing *129 the deductions, the Ballin Agency assigned a five-year useful life to the intangible assets. Respondent disallowed the claimed deductions for all three years. Facts relating to debt-equity issue Ballin Inc. was organized on or about January 24, 1942, under the laws of New Jersey with an authorized capital stock of 1,000 shares having no nominal or stated value. At that time Ballin Inc. issued nine shares of stock to Ballin and one share to his wife, Eva, in exchange for $1,500. During the years 1950 through 1962 Ballin Inc. acquired a number of insurance businesses. It did not have the necessary capital to finance these acquisitions, nor did it have sufficient collateral or credit necessary to obtain loans from banks or other lending institutions. Beginning in 1950 Ballin advanced funds needed by the corporation to finance its acquisitions. The advances were evidenced by unsecured demand notes, many of which carried no rate of interest. By the end of 1961 Ballin had advanced the corporation a total of $276,200. For this same period, early 1950 until May 1961, the corporation's paid-in capital was $1,500. The following schedule shows the year, amount of the advances, the *130 number of notes executed with interest, and the number executed without interest: Year
Advances
CumulativeAdvances
Notes WithInterest
NotesWithout Interes t
TotalNotes
1950
$ 14,000
$ 14,000
1
1
2
1951
9,000
23,000
5
5
1952
9,500
32,500
8
8
1953
11,500
44,000
4 4
1954
30,200
74,200
2
4
6
1955
8,000
82,200
1
1
2
1956
21,000
103,200
8
8
1958
12,000
115,200
3
3
1959
11,000
126,200
2
2
1960
94,500
220,700
11
11
1961 55,500
276,200
11
11
$276,200
$276,200
15
47
62
During the years 1950 through 1961, the corporation made no payments with respect to the principal of the alleged loans and did not establish a sinking fund to retire them. No dividends were declared or paid during such period. Ballin obtained the monies which he advanced the corporation from banks in the form of personal loans secured by securities owned by him. On May 31, 1961, Ballin Inc. and Plasschaert entered into an agreement under which Plasschaert was to acquire, among other things, 10 shares of the corporation's common stock having a stated value of $50,720. As consideration for the stock, Plasschaert, *131 under the agreement, was to give the corporation (1) his insurance business valued at $22,500, (2) an automobile valued at $1,800, and (3) 16 promissory notes payable annually having a total face value of $26,420. As of December 31, 1961, the corporation's stated or paid-in capital, according to its balance sheet, was $52,220. In early 1962 Ballin Inc. contemplated a merger with Edward Adelman and Leonard B. Greenberg, doing business as L. B. Greenberg Agency, a partnership. On April 14, 1962, prior to the proposed merger, and because of it, Plasschaert and Ballin agreed to cancel the $26,420 indebtedness which Plasschaert owed to the corporation. Under this agreement, Plasschaert surrendered for 1068 cancellation his 10 shares of stock in Ballin Inc. In exchange, Plasschaert received after the merger 12 shares of Class B nonvoting stock of the corporation. On April 17, 1962, Ballin Inc. entered into an agreement of merger with Adelman and Leonard. The respective interests of Ballin, Adelman, and Greenberg in the merged business was determined on the basis of the net commission income of the merged entities. Under this arrangement, Ballin received an 80 percent interest in *132 the business and Adelman and Greenberg each received a 10 percent interest. The agreement, inter. alia, provided for a recapitalization of Ballin Inc. under which the advances of $276,200 by Ballin to the corporation were to be considered paid-in surplus. On December 31, 1962, the balance sheet of Ballin Inc. disclosed the following: Loans payable to shareholders
$17,500.00
Paid-in surplus
250,146.12
Capital
52,220.00
The "Loans payable to shareholders" represented an advance from Ballin subsequent to the merger and the recapitalization. The corporation's outstanding liabilities, capital, and debt to equity ratios for 1960 and 1961 were as follows: Period
ShareholderAdvances
Liabilities
Capital
Debt-Equi tyRatio
1960
$220,700
$440,603.21
$ 1,500
293 to 1
1961
Jan. 1 - May 31
276,200
484,152.92
1,500
322 to 1
1961
June 1 - Dec. 31
276,200
484,152.92
52,220
9 to 1
On its Federal corporate income tax returns for 1960 and 1961, Ballin Inc. claimed interest deductions of $9,145 and $12,070.50, respectively, for amounts paid to Ballin as interest on the advances. Respondent disallowed the claimed interest deductions *133 for the years 1960 and 1961. Ultimate Findings of Fact 1. The amount of the capital gain recognized by Delman in 1962 and 1963 with respect to the 1960 installment sale of the UHA business is as follows: *10
Taxable Year
Total
1962
1963
Proceeds and gain realized
$156,000
$43,680
$21,840
Less: Expenses of sale 3,900
1,092
546
Capital gain recognized
$152,100
$42,588
$21,294
2. No portion of the consideration for the sale of the UHA business was for future commissions earned prior to the sale. 3. The gain realized by the Delmans from the 1960 installment sale of the stock of the Delman Agency constitutes gain from the sale of a capital asset. 4. The amount of the capital gain recognized by the Delmans in 1962 and 1963, with respect to the 1960 installment sale of stock of the Delman Agency, is as follows: * 10
Taxable Year
Total
* 1962
** 1963
Proceeds
$44,000
$12,320
$6,160
Less: Tax basis for stock 500
140
70
Gain realized
$43,500
$12,180
$6,090
Less: Expense of sale 1,100
308
154
Capital gain recognized
$42,400
$11,872
$5,936
*134 1069 5. The amounts received by the Delmans, less the expenses of sale, under the 1960 agreement with Ballin for the sale of UHA business (including, but not limited to, the transfer of the ACC Agency agreement, insurance expirations, contracts, customer lists, books and records, and trade name) constitute gain from the sale of a capital asset. 6. The "advances" by Ballin to Ballin Inc. during the years 1950 through 1962 were, for Federal income tax purposes, capital contributions and not loans. Opinion We will first consider whether Ballin Inc. is entitled to a depreciation deduction under section 167 in each of the years 1960, 1961, and 1962 with respect to assets received by it in purchasing all or part of insurance agency businesses. [3]
With respect to the stock acquisition, the facts herein clearly show that Ballin Inc. purchased the stock of the Delman agency, and not the naked right to commissions on renewal premiums. There is no evidence that Ballin Inc. caused the assets of the Delman Agency to be distributed to it in complete *135 liquidation under sections 332 and 334(b)(2). To the contrary, Ballin Inc., after changing the corporation's name to United Health Agency, Inc., continued it in existence. Ballin Inc. did not directly acquire the assets of the Delman Agency; it merely acquired the stock of such corporation. Accordingly, it has no tax basis with respect to any of the assets of the Delman Agency to depreciate under section 167. Therefore, the only question remaining with respect to the stock transaction is whether any portion of the proceeds from the sale thereof is attributable to the covenant not to compete, and this issue will be discussed later. Respondent argues that Ballin Inc. acquired insurance expirations and other intangible assets that are either goodwill or tantamount thereto, that have an indeterminable useful life, and that are not the subject of a depreciation allowance under section 167 and the regulations thereunder. [4]
*136 Respondent's determination is, of course, presumptively correct and the burden of proving it erroneous falls upon the petitioner. Welch v. Helvering, 290 U.S. 111 (1933). Section 167(a) provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in a trade or business. Section 1.167(a)-3, Income Tax Regs., provides, in pertinent part, as follows: If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible *137 asset has limited useful life. No deduction for depreciation is allowable with respect to goodwill. Ballin Inc. contends that it should be allowed to depreciate, or amortize, the total cost of acquiring such insurance businesses since it acquired only the right to commissions on renewal premiums, an intangible wasting asset, "absolutely ascertainable as to life", and that the sale by Delman of the UHA business was an anticipatory assignment of his right to future income for past services. To the contrary, the Delmans claim that they sold, and Ballin Inc. received, going insurance businesses with the concomitant goodwill and they deny that the transaction constituted an anticipatory assignment of income on their part. Ballin Inc. relies on Hugh H. Hodges, 50 T.C. 428, 441 (1968); Frances E. Latendresse, 26 T.C. 318 (1956), affd. denied 355 U.S. 830; Lewis N. Cotlow denied 355 U.S. 830; Lewis N. Cotlow, 22 @T.C. 1019 (1954); H.B. Hill, 3 B.T.A. 761 (1926), as authority for the proposition that it is entitled to recover the cost of the right to the commissions in determining the income it receives therefrom. These *138 cases, however, are inapposite to the facts herein for two reasons: (1) Ballin Inc. did not acquire the mere right to commissions; and (2) 1070 even if it did acquire only the right to commissions, there is no competent evidence fixing with any degree of accuracy the useful life of the acquired asset. The facts clearly show that Ballin Inc. acquired insurance expirations. It is well recognized in this Court that insurance expirations are either a part of goodwill, which is not subject to depreciation, or are so inextricably linked with goodwill as to have an indefinite useful life and therefore not depreciable. SeeHugh H. Hodges, supra; Alfred H. Thoms, 50 T.C. 247 (1968); Marsh & McLennan Inc., 51 T.C. 56 (1968); but compare Savings Assurance Agency, Inc., 22 T.C.M. 200 (1963), which we regard as distinguishable for the same reason expressed in footnote 3 in the Thoms opinion at p. 254. The close connection between insurance expirations and goodwill was underscored by the Court of Appeals in V. L. Phillips & Co. v. Pennsylvania Threshermen, 199 F. 2d 244, 246 *139 (C.A. 4, 1952): "Expirations" in the insurance field has a definite and well recognized meaning; it embodies the records of an insurance agency by which the agent has available a copy of the policy issued to the insured or records containing the date of the insurance policy, the name of the insured, the date of its expiration, the amount of insurance, premiums, property covered and terms of insurance. This information enables the agent to contact the insured before the existing contract expires and arms him with the information essential to secure another policy and to present to the insured a solution for his insurance requirements. It has been determined that this information is of vital assistance to the agency in carrying on the insurance business and it has become, in the insurance field, recognized as a valuable asset in the nature of good will. This definition or characterization of "expirations" has been cited with approval in Alfred H. Thoms, supra, at 254; see also George J. Aitken, 35 T.C. 227, 229 (1960). Samuel Ballin testified that the term "expirations" was borrowed from the fire and casualty business and is inapplicable in the accident *140 and health business, but failed to give any explanation of its inapplicability. Ballin attempts to distinguish Hodges, Thoms, Marsh & McLennan, Inc. and Aitken on the ground that the insurance involved in each of those cases was fire and casualty. We see no substantial difference between fire and casualty insurance and health and accident insurance to merit the application of a different rule of law. [5] In short, there is no logical or practical distinction which excludes this case from the rationale of the Hodges, Thoms, and Marsh & McLennan cases. Correlatively, we hold that Delman's gain on the sale of the UHA business was gain from the sale or exchange of capital assets. SeeGeorge J. Aitken, supra; Edward A. Kenney, 37 T.C. 1161, 1173 (1962). We realize that certain cases have reached a different conclusion. See Vaaler Insurance, Inc. v. United States ( D.N. Dak. 1968, 21 A.F.T.R. 2d 558); Weaver v. United States ( W.D. Okla. 1965, 15 A.F.T.R. 2d 1073). But we do not find these cases persuasive under the circumstances present herein. We reject, as contrary *141 to fact, Ballin's argument that the only item bargained for during the negotiations was the right to commissions on renewal premiums. Although Samuel Ballin testified that he was concerned only with acquiring the right to commissions, the provisions of the agreement of sale disclose that Ballin Inc. acquired going insurance businesses, which included "the right to expirations" under the UHA-ACC agency agreement, the agency agreement UHA had with ACC, all of UHA's contracts with agents and brokers pertaining to or relating to ACC business, all originals and copies of customer lists and records, all the books and documents relating to or flowing from the agency agreement, and the exclusive right to the name "United Health Agency." There is nothing in this record convincing us that the purchase price was paid for anything other than that stated in the agreement. "Those things consisted of records, goodwill, and intangibles in the nature of goodwill, and were capital assets." Edward A. Kenney, supra at 1173, see also George J. Aitken, supra. It is significant, we think, that the agency agreement which Ballin acquired, the agreement of sale of July 1, 1960, and *142 the closing agreement of July 10, 1960, all make reference to "expirations." As we have already seen, "expirations" has a definite and well 1071 recognized meaning in the insurance business. Samuel Ballin was aware that the agreement provided that his corporation was acquiring the "right to expirations." We infer from these facts that Ballin, a man experienced in the acquisition of insurance businesses, understood and intended "expirations" to be used in its definite and well recognized meaning of "a valuable asset in the nature of goodwill." V.L. Phillips & Co. v. Pennsylvania Threshermen, supra at 246. Ballin Inc. insists that the accident and health policies involved herein are analogous to life insurance policies as to which amortization is permitted. Section 809(d) (12); section 1.817-4(d), Income Tax Regs. We rejected this same argument in International Life Insurance Company, 51 T.C. 765 (1969), where we said (at 773-774): petitioner, unlike the insurer of life insurance policies, retained the right at any time to cancel policies, raise *143 premium rates, and alter the scope of coverage. These rights allowed petitioner through direct and indirect means to affect the lapse rate of the policies. Petitioner could cancel high-risk policies, thereby retaining only low-risk policies, which would cause a high termination rate in early years followed by a low termination rate in later years. In addition, changes in the rate structure and coverage, if atypical of action by the insurance industry generally, would have a substantial impact on lapse rates. This record reveals that the policies could be renewed only with the consent of the insurer, ACC, that ACC, in some instances, required a waiver of liability as a condition to its consenting to renew policies, and that ACC did not renew those policies which were unprofitable. These rights, just like those retained by the insurer in International Life Insurance Co., " allowed [ACC], through direct and indirect means, to affect the lapse rate of the policies." We think the health and accident policies are distinguishable from life insurance policies on this basis. For this reason we think Ballin's argument that such policies are analogous to life insurance policies is without *144 merit. The rationale of our decision in International Life Insurance Co. applies here even though petitioner is the agent and not the insurer who possessed the right or power to affect the lapse rate of the policies. The identity of the person or entity holding such a power is not significant. What is significant is that the right or power to affect the lapse rate, in fact, exists. But even under the present facts, Ballin Inc. possessed some degree of control over the lapse rate because, under the provisions of the agency agreement with ACC, it was delegated the authority to cancel policies where cancellation is legally possible. As we have indicated in our findings of fact, there are a number of other distinguishing characteristics between health and accident insurance and life insurance. We see no need to repeat them. While we agree with Ballin that the purchase price of the insurance businesses from the Delmans was computed on the basis of 19 times the monthly commissions, we do not agree that it follows that Ballin Inc. purchased only the right to commissions on renewal premiums. Admittedly, Ballin Inc. was concerned with the value of the future earning power of the insurance *145 businesses. The capitalization of earnings method used to value businesses is generally considered a reliable method of gauging the business' ability to earn a profit, and is a method commonly used in the evaluation of a going insurance business. [6] The fact that the purchase price of an insurance business, as here, is measured in terms of commission income does not necessarily mean that the purchaser is acquiring the mere right to future commissions.
Ballin Inc. contends that the transaction on Delman's part was no more than an anticipatory assignment of his right to earned commissions and that the proceeds therefrom are taxable to Delman as ordinary income, citing Helvering v. Eubank, 311 U.S. 122 (1940); Floyd L. Turner, 38 T.C. 304 (1962); and Hugh H. Hodges, supra at 436-439. The difficulty with this line of reasoning is that it is based on the faulty premise that Delman sold or assigned merely the right to future income. In each of the cited cases the right to receive the commissions was conditioned only upon renewal by the insured; the taxpayer in each *146 of those cases had an admittedly vested, though contingent in amount, right to future income and was merely assigning the power of collection under that right to a third party. Lyon and Eustice, "Assignment of Income: Fruit and Tree as Irrigated by the P.G. Lake Case," 17 Tax L. Rev. 295 (1962). In other words, the 1072 assignor prior to the assignment had performed all the necessary services incident to the earning of the income or commission. No future services of any kind were left to be performed by the assignee. That is not the situation here. It cannot be said, as a matter of law, that the renewal commissions had already been earned prior to the transaction between Delman and Ballin. We have found as a fact that Ballin Inc. was required to render services incident to the earning of commissions with respect to the acquired businesses after July 10, 1960. In our opinion, Ballin Inc. - not Delman - was the "tree" producing the commission income after July 1960. The facts here are strikingly parallel to those in Commissioner v. Killian, 314 F. 2d 852, 855-856 (C.A. 5, 1963), affirming a Memorandum Opinion of this Court, where the Court of Appeals said: *147 the payment to [the seller] under these facts was not a lump sum consideration essentially a substitute for what would otherwise be regarded at a future time as ordinary income. SeeCommissioner of Internal Revenue, et al. v. P.G. Lake, Inc., et al., 356 U.S. 260. There was nothing here which was automatic, perfunctory or legally enforceable coming to [the purchasers] which could be equated with [the seller's] future income. Neither they nor [the seller] could do more than project, prospectively, the value of [the seller's] relationship with the policy holders identified on the informational data. Ballin Inc. received nothing which was "automatic, perfunctory, or legally enforceable" from Delman which could be equated with Delman's future income. We are satisfied that the sale of the UHA business by Delman was not a device to convert rights to future ordinary income into present capital gains. Consequently, we hold that the proceeds from the sale of his insurance business are not taxable to Delman as ordinary income under the rationale of the anticipatory assignment *148 of income doctrine. Cf. Commissioner v. P.G. Lake, Inc., 356 U.S. 260 (1958). Even if we assume, arguendo, that Ballin Inc. acquired only the right to commission on renewal premiums, it still would not be entitled to depreciate the cost thereof because it has failed to establish the useful life of such right. The burden of showing that the intangible asset had a limited and determinable useful life is clearly on Ballin. Thrifticheck Service Corporation, 33 T.C. 1038 (1960), affd. 287 F. 2d 1 (C.A. 2, 1961). Surprisingly enough, the only evidence directly bearing on this point was Delman's testimony that, based on his "best recollection," the average life of an accident and health policy was 6 1/2 to 7 years. Indeed, this, at best, is no more than Delman's unsupported opinion. The record says nothing of the factual basis, if any, for such an opinion, and section 1.167(a)-3, Income Tax Regs., clearly provides: "No allowance will *149 be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life." Moreover, we attach great weight to the testimony of respondent's expert witness who testified that, because of the numerous variables involved, there was no way of determining the life of an accident and health policy. The fact that the insurer possessed the power to effect the lapse rate of the policies is another indication that such policies had an unascertainable life. The evidence, contrary to Ballin's claim on brief, does not establish "exactly" when and how many policies lapsed. The only evidence offered to substantiate the number of policies that lapsed from July 1, 1960, the date Ballin purchased the insurance businesses, until August 1968, is the testimony of Harriet Chenitz, Samuel's daughter. She testified that she made notations on a listing of the policyholders, but "abandoned trying to analyze from the markings [she] had made * * * and went ahead to get the actual premium and commission figures from the copies of the reports * * * made to [ACC]." Yet as far as we can determine, the number of lapsed policies offered into evidence is made on *150 the basis of Harriet's analysis which was "abandoned." This evidence is too vague and contradictory to establish with reasonable accuracy the actual lapse rate of the policies acquired from the Delmans. Further doubt is cast upon the method used to determine the number of lapsed policies by the possibility that Harriet failed to take into account the lapsed policies which were rewritten under Ballin's name. In any event, Ballin has failed to show any correlation between the lapse rate and the useful life of accident and health policies. In International Life Insuronce Co., supra at 774, we found that the rate at which policyholders were actually lost disclosed merely "a random variation to which we can ascribe no pattern to 1073 determine a useful life of the policies." We conclude that Ballin's unsupported and generalized allegations fall far short of the proof required to establish the useful life of the intangible asset in issue. This "reflects perhaps an inherent obstacle to the amortization of cancellable health and accident policies." International Life Insurance Co., supra at 774
In the alternative, Ballin contends that, if the cost of the property *151 acquired is not depreciable, a substantial portion of the purchase price should be allocated to the covenant not to compete, notwithstanding the absence of such an allocation in the agreement of sale, and that amortization of such amount should be allowed over the life of the covenant, i.e., 5 years. To support this contention, Ballin must establish that the parties, at the time they entered into the agreement, intended to allocate some portion of the purchase price to the covenant. Annabelle Candy Co. v. Commissioner, 314 F. 2d 1, 8 (C.A. 9, 1962). We conclude, on the basis of all the evidence, that the parties did not intend to allocate any value to the covenant not to compete. Several factors support the conclusion that no consideration was paid, or intended to be paid, for the noncompete covenant. First, the agreement of sale between Delman and Ballin contained no allocation to the covenant. The failure to make a specific allocation to the covenant in the agreement is not determinative, but it is "pretty good evidence" no allocation was intended. Annabelle Candy Co. v. Commissioner, supra at 7; *152 Delsea Drive-In Theatres, Inc. v. Commissioner, 379 F. 2d 316 (C.A. 3, 1967), affirming a Memorandum Opinion of this Court; Rinehart Oil News Co. v. Commissioner, 369 F. 2d 692 (C.A. 5, 1966), affirming per curiam a Memorandum Opinion of this Court. Second, the evidence shows that the failure to specifically allocate any value to the covenant in the agreement was intentional. Ballin's testimony that there was no discussion of allocating any amount of the consideration to the covenant is contrary to fact. The evidence shows that Cohen, Delman's attorney during the negotiations, advised Ballin that "no part of the purchase price was to be allocated to the covenant," and that Ballin replied that he understood and it was quite all right with him. Despite the fact that he was represented by counsel during the negotiations, Ballin contends that he "did not have knowledge at that time of the importance of allocating a value to [the noncompete covenant]." This, however, is not a sufficient basis to relieve Ballin of the tax consequences flowing from the agreement where he was represented by competent counsel who comprehended the substance of the transaction. *153 SeeYandell v. United States, 315 F. 2d 141 (C.A. 9, 1963). Thus, since neither Delman nor Ballin placed any independent value on the covenant not to compete, we can ascribe none to it. Edward A. Kenney, supra.
Third, Delman and Ballin had agreed upon the purchase price for the insurance businesses before there was any discussion about the covenant not to compete. This is further proof that no part of the consideration paid for the Delman acquisition was for the covenant not to compete. Delsea Drive-In Theatres, Inc. v. Commissioner, supra; Merle P. Brooks, 36 T.C. 1128, 1135 (1961). There is no evidence that the insurance expirations and the other intangible assets - excluding the covenant - acquired by Ballin were worth less than the agreed purchase price. Fourth, Ballin was well aware during all stages of the negotiations that the Delmans were in the process of purchasing the Great Northwestern Life Insurance Company, a Pennsylvania company which could only do business within that State, and were going to leave New Jersey. Shortly *154 after the sale was completed the Delmans did in fact move to Philadelphia where they have operated the Great Northwestern Life Insurance Company. This factor has been considered persuasive that no portion of the consideration was for the covenant. Commissioner v. Killian, supra. Finally, the function of the covenant was to assure Ballin the beneficial enjoyment of the goodwill, including the insurance expirations, acquired from the Delmans; it had no independent significance apart from assuring the effective transfer of such goodwill. See Alfred H. Thoms, supra at 25; Ullman v. Commissioner, 264 F. 2d 305 (C.A. 2, 1959), affirming 29 T.C. 129 (1957). In a real sense the covenant herein was superfluous, nonessential, and without any independent value because Delman's right to compete with Ballin was not restricted or limited to any greater extent by the covenant than it was by local law. Under the provisions of the covenant, Delman 1074 promised only to refrain from doing any business, directly or indirectly, with any person who, on July 1, 1960, was listed upon the books and records of UHA and J.H. Delman Agency, Inc., as a policyholder *155 of ACC, or with any agent or broker then doing ACC business with such agencies. Unlike the customary noncompete covenant, the instant covenant did not restrict Delman's right to engage in the insurance business in the same vicinity in actual competition with Ballin. In other words, the covenant in effect imposed on Delman only the obligation not to solicit old customers. The rule is well recognized in New Jerseythat a person who sells a going business, including goodwill, "may not specifically solicit the trade of those who were customers of the old business." Hilton v. Hilton, 89 N.J. Eq. 182, 104 Atl. 375, 377 (1918); Reardon Laundry Co. v. Reardon, 97 N.J. Eq. 356, 128 Atl. 482 (1925); see also Alfred H. Thoms, supra at 256, and authorities cited therein. Since the covenant restricted Delman's right to compete only to the extent that he could not solicit "old customers" it was of little or no value, because Delman would have been, in any event, precluded by State law from soliciting those who were customers of UHA and the Delman Agency, Inc. *156 , in the absence of the noncompete agreement. Consequently, there was actually no reason for Ballin to pay valuable consideration to Delman for the covenant. The final issue is whether advances in the amount of $276,200 to the petitioner Ballin Inc. by Samuel S. Ballin, its principal shareholder, were contributions to capital, as respondent contends, or loans entitling Ballin Inc. to deduct the interest paid or accrued under section 163(a), as Ballin contends. It is well established that this question, essentially a factual one, must be determined on the basis of all the facts and circumstances of each case, with no single factor being determinative. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946); Gooding Amusement Co. v. Commissioner, 236 F. 2d 159 (C.A. 6, 1956), affirming 23 T.C. 408 (1954); C.M. Gooch Lumber Sales Co., 49 T.C. 649 (1968); and Malone & Hyde, Inc., 49 T.C. 575 (1968). Since "things are seldom what they seem, skim milk masquerades as cream, [7] the substance and not the form of the transaction *157 determines whether the shareholder advances here are to be treated, for Federal tax purposes, as debt or equity. In Joseph W. Hambuechen, 43 T.C. 90, 99-100 (1964), we indicated that the following factors should be considered in determining the character of advances: Such factors as adequacy of the capitalization of the debtor, issuance of any notes, provision for and payment of interest, presence or absence of a maturity date, intention to repay, whether the alleged debt is subordinated to claims of outside creditors, whether outside creditors would have made similar advances under the circumstances, presence or absence of security for the alleged loan, reasonableness of expectation of payment, use to which the funds were put, and whether payment can only be paid out of future profits, are a few of those most frequently mentioned. SeeArlington Park Jockey Club v. Sauber, 262 F. 2d 902, 905 (C.A. 7, 1959); Nassau Lens Co. v. Commissioner, 308 F. 2d 39, 47 (C.A. 2, 1962), remanding for other reasons 35 T.C. 268 (1960). *158 It has been aptly stated that "the essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event." Commissioner v. Meridian & Thirteenth R. Co., 132 F. 2d 182, 186 (C.A. 7, 1942), reversing 44 B.T.A. 865 (1941). Although no one factor by itself is determinative of the question, a significant factor is "whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture, or were placed at the risk of the business." Gilbert v. Commissioner, 248 F. 2d at 406. Applying these criteria to the facts herein, we conclude (1) that the capitalization of Ballin Inc. was inadequate, which is indicative of the high risk attaching to the amounts allegedly loaned to the corporation; (2) that Ballin Inc. could not have obtained the funds from outside sources on comparable terms; (3) that Samuel Ballin's claim was subordinated to outside creditors; (4) that the corporation made no repayment in respect of the amounts purportedly "borrowed" during the period 1950 through *159 1961; (5) that the advances were unsecured; (6) that payment could only be paid out of future profits; and (7) that the advances were not made with the expectation of repayment regardless of the success of the business. 1075 Accordingly, in view of these facts and circumstances, we hold that the advances were capital contributions and that respondent correctly disallowed the claimed interest deductions for the years in question. Decisions in all dockets will be entered under Rule 50. Footnotes
1. Consolidated herewith are the following cases: S. S. Ballin Agency, Inc. and Subsidiary Company, Docket No. 6226-66, and Joseph Delman and Jeanette Delman, Docket No. 932-67.↩
2. All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
*. Includes only 9 months of 1968.↩
*. 28 percent of total ↩
**. 14 percent of total↩
3. Respondent and Ballin have agreed that the law applied with respect to the Delman acquisitions applies to the other acquisitions.↩
4. Respondent argues in the alternative that, if we agree with Ballin that it merely acquired the right to commissions on renewal premiums, the proceeds from the sale are taxable to Delman as ordinary income. He further argues that, assuming arguendo, Ballin acquired only the right to commissions, Ballin still would not be allowed to depreciate the cost of the commissions because it failed to establish with "reasonable accuracy" the period of time during which the commissions will be received, i.e., the useful life of the intangible asset.↩
5. SeeMeyer Morris, T.C. Memo. 1968-295↩.
6. SeeGeneral Insurance Agency, Inc., T.C. Memo. 1967-143↩.
7. H.M.S. Pinafore, Act 2.↩